Filed 12/14/15  P. v. Bastida CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MIGUEL ANGEL BASTIDA, JR.,<br><br>        Defendant and Appellant. | A140266<br><br>(Solano County<br>Super. Ct. No. FCR291584) |
| MIGUEL ANGEL BASTIDA, JR.,<br><br>        On Habeas Corpus. | A146151 |

Defendant Miguel Angel Bastida, Jr., appeals a judgment convicting him of first degree felony murder and sentencing him to a term of 50 years to life in prison. He contends his constitutional rights were violated by the admission at trial of an involuntary confession and his brother's involuntary statements to the police. He also contends the court made other prejudicial evidentiary and instructional errors and that the prosecutor committed prejudicial misconduct. Defendant has also filed a petition for a writ of habeas corpus in which he contends that the prosecutor failed to provide impeachment evidence pertaining to the prosecution's forensic expert, in violation of *Brady v. Maryland* (1963) 373 U.S. 83, and that his trial attorney provided ineffective assistance of counsel. We have consolidated the two proceedings for disposition. We find no prejudicial error and thus shall affirm the judgment and deny the petition for a writ of habeas corpus.

1

**Factual and Procedural Background**

Defendant was charged by information with the murder of Jesus Amaya (Pen. Code, § 187, subd. (a)). It was alleged that in connection with the offense he personally used and discharged a firearm (Pen. Code, §§ 12022.53, subds. (b), (c), (d), (e)(1), 12022.5, subd. (a)(1)). It was further alleged that the offense was committed for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)).

The following evidence was presented at trial:

The victim's mother testified that on February 1, 2012, sometime after 11:00 p.m. at her home in Fairfield, she was awakened by gunshots. She found her son outside her front door covered in blood. He subsequently died from a gunshot wound on the left side of the back of his neck. According to the autopsy report, the barrel of the gun was against the skin when the gun was fired. There was an exit wound on the right side of his face. No other wounds or signs of injury, bruising or swelling were found on the victim's head or face.

The victim's neighbor testified that sometime between 11:30 and midnight, a girl named Liz came to her door, asking for her daughters, Rosa and Laura. The neighbor told Liz her daughters were already asleep. About five minutes later, she heard gunshots.

On February 24 and March 7, two police detectives interviewed defendant about the shooting. During the February 24 interview, defendant claimed that he was in San Francisco on the night of the killing.

Portions of a video recording of the March 7 interview were shown to the jury by both the prosecution and the defense. In the portions played by the prosecutor, defendant told the detectives that he, his girlfriend Liz , "Mario," and two others were together drinking before the shooting. They stopped at Laura's house and Liz went to the door. Laura did not come out so they left. When they saw the victim walking down the street alone, defendant and Mario asked him for a cigarette to get him to stop. When the detectives asked if they were "gonna rob" the victim, defendant answered "we weren't thinking of shooting him." The detective then asked, "I'm pretty sure you weren't thinking of shootin' him . . . [b]ut were you thinkin' to rob him?" Defendant said "Yeah."

2

Defendant told the detectives he hit the victim in the head with a rock and Mario shot him. The next day they learned that the victim had died. Defendant told his brother what happened.

Defendant's brother Cruz testified at trial. Cruz testified that because of a learning disability, he had been in special education since elementary school and had difficulty understanding things. He remembered being interviewed by the police on March 7, 2012, but could not remember anything he said to them. He claimed that he did not tell the truth to the police and that the police scared him by telling him that he and his family were in danger. Cruz told the police whatever they wanted to hear in order to help his brother.

Cruz's police interview was shown to the jury. Cruz was 15 years old at the time of the interview. Cruz told the officers that the day after the shooting he asked defendant if he knew who committed the murder or if he had heard about the murder. Defendant said he had been in Hayward and did not know about it. Then he started to laugh and he said he "did it" and walked away. Defendant's sister told Cruz that defendant was just "playing" and did not do it. Cruz got mad and told defendant not to lie to him. Later, defendant told Cruz that he was there at the shooting. He was with his girlfriend, Mario and others, and they saw the victim after they went to Laura's house to see if she was home. Defendant knew that the victim was a Sureño and he and Mario were "thinking" about robbing the victim. Mario asked the victim for a cigarette but the victim kept walking. Defendant ran up behind the victim and hit him with his gun, then he and the victim started fighting. Both Mario and defendant pulled out guns and started firing. Defendant told Cruz that he shot at the victim and his shot missed, but Mario's shot hit the victim in the face or chest. Later, Cruz admitted that his brother had not told him where the victim was shot and that other people had given him that information. After the shooting, defendant and Mario met the others at Mario's house. Defendant said that he "ditched" his gun in Laurel Creek Park. One of defendant's friends went to the park to get the gun.

A recording of a jail phone call from defendant to his mother was played for the jury. On the recording, defendant told his mother that he was locked up for a probation

3

violation. He said that he told the police everything about the shooting, including that Mario did it.

The parties stipulated that "[t]he Norteños are a criminal street gang as it relates to the alleged gang enhancement." An expert on Fairfield's criminal street gangs testified that in his opinion defendant and Mario were Norteño gang members and that the victim was a member of the Sureño criminal street gang. He testified that the Norteños and Sureños are rival gangs. He opined that the shooting was done for the benefit of and in association with the Norteños to show their superiority and willingness to be violent.

The defense presented two witnesses who testified that the gun shots they heard that night sounded as if they were fired from the same gun. The defense also presented an expert witness in "gang culture" who opined that the shooting was not for the benefit of the gang.

Defendant played additional portions of his videotaped police interviews to establish that his confession was coerced. Defendant's expert testified regarding police coercion tactics and false confessions and admissions. He went through defendant's interview noting what he characterized as the detectives' threats and promises. He explained how such threats and promises are powerful techniques that can break down people and cause them to comply, but also create a risk of false or unreliable statements. He also testified that misrepresentations by officers, such as the detectives' assertions that there were multiple videos of him in the area, also increase the risk of a false confession. The expert testified that a reasonable limit for the length of an interrogation is six hours, but the interrogation period in this case, which included long periods defendant was held alone in the interview room, was eight hours. He saw evidence of contamination or scripting in the interrogation, which occurs when suspects either incorporate details supplied to them by law enforcement during questioning or change a version of the facts when given details by officers. He noted that inconsistencies between a defendant's statements and the physical evidence or forensics are also demonstrative of unreliability.

Finally, defendant called as a witness the detective who interviewed him on February 24. The detective acknowledged that during the February 24 interview, he told

4

defendant that he had information that "somebody got robbed and someone got stupid and it got out of hand" and drew a distinction between the situation when a robbery goes bad and someone dies and the situation where a friend shoots at a house and kills a sleeping kid.

In closing argument, the prosecution argued that defendant was guilty of first degree felony murder because Mario killed the victim while he and defendant were committing a robbery or attempted robbery. The defense argued that the only evidence of an attempted robbery came from the statements made by defendant and Cruz, which defense counsel argued were involuntary and unreliable.

The jury found defendant guilty of first degree felony murder and found the gun and gang enhancements true. Defendant was sentenced to 50 years to life in prison and filed a timely notice of appeal.[1]

## Discussion

1.  *Defendant's Confession*

Prior to trial, defendant moved to exclude his confession on the ground that it was involuntary. The trial court denied defendant's motion, finding that under the totality of circumstances his confession was voluntary. On appeal, defendant renews his contention that the confession was involuntary and argues that its admission violated his right to due process under the state and federal constitutions. He argues further than his confession was obtained in violation of his *Miranda*[2] rights and that his attorney rendered ineffective assistance in failing to move to exclude his confession on that ground as well.

The confession was voluntary.

The federal and state Constitutions bar the use of involuntary confessions against a criminal defendant. (*Jackson v. Denno* (1964) 378 U.S. 368, 385-386; *People v. Benson* (1990) 52 Cal.3d 754, 778.) "The test for determining whether a confession is voluntary is whether the questioned suspect's 'will was overborne at the time he confessed.' "

---

[1] Defendant's unopposed request for judicial notice and his application to augment the record are granted.

[2] *Miranda v. Arizona* (1966) 384 U.S. 436

5

(*People v. Cruz* (2008) 44 Cal.4th 636, 669.) In determining whether a defendant's will was overborne, " 'courts apply a "totality of the circumstances" test [and look] at the nature of the interrogation and the circumstances relating to the particular defendant.' [Citation.] 'With respect to the interrogation, among the factors to be considered are " ' "the . . . element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; [and] its continuity" . . . .' " ' [Citation.] 'With respect to the defendant, the relevant factors are " ' "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health." ' " ' " (*People v. Thomas* (2012) 211 Cal.App.4th 987, 1008, quoting *People v. Dykes* (2009) 46 Cal.4th 731, 752.)

"When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness." (*People v. Vasila* (1995) 38 Cal.App.4th 865, 873.) "The state bears the burden of proving the voluntariness of a confession by a preponderance of the evidence." (*People v. Dykes*, *supra*, 46 Cal.4th at p. 753.)

Defendant argues that his confession was the product of coercive promises and threats. " ' "A statement is involuntary [citation] when, among other circumstances, it "was ' "extracted by any sort of threats . . . [or] obtained by any direct or implied promises . . . ." ' " ' " (*People v. Dykes*, *supra*, 46 Cal.4th at p. 752.) " 'However, mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. . . . Thus, "[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made. [Citation.] On the other hand, "if . . . the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible . . . ." ' " (*People v. Holloway* (2004) 33 Cal.4th 96, 115.)

Defendant contends the detectives repeatedly made implied promises that they could make a deal with him for his release from jail if he confessed to his involvement in the homicide, and that the detectives combined these promises with threats that if he did not confess, he would serve life in prison. Defendant also claims the detectives made threats to his physical safety in jail and threats to the safety of his family, and improperly implied the judge would be more lenient if he confessed. He argues that these threats and promises combined with the excessive length of the interrogation and his personal vulnerability as a Norteño gang member resulted in an involuntary confession.

Initially, we note that the video recording of defendant's interrogation is included in the record and has been viewed by this court. According to the video recording, defendant was left alone in the interview room for two hours and 15 minutes before the interrogation began. The detectives then questioned him for about 44 minutes before leaving for a short break. Shortly after the detectives returned, defendant began acknowledging his involvement in the crime. Defendant thus began confessing within four hours of being placed in the interview room and after less than an hour of questioning by the detectives. The length of the interrogation was hardly extreme. While defendant describes the detectives' statements as "threats," nothing in the detectives' demeanor can be characterized as angry or menacing. The detectives remained calm and did not raise their voices throughout the interrogation. Although defendant was uncomfortable in his handcuffs, the detectives loosened them immediately when defendant complained that they were too tight.

We disagree with defendant's suggestion that the detectives made implied threats of harm to him or his family. Defendant indentifies as indicative of the asserted threats the following statements of one detective: "You're already in a heap because we got your kites [surreptitious notes transmitting messages among inmates].[3] And you know that's not gonna go well when you go back[,] if you go back. That's not gonna be good that we

---

[3] The kites from one gang member to another indicated that defendant was also a trusted gang member.

found those, for you. Right or wrong?" Later, the same detective said "we both know if you go [back to jail], you're gonna have to get [placed in protective custody]. . . . Cause we know that, once we found those kites, that your world was fucked. Cause . . . Lurch is going to be pissed off . . . [a]nd I know Lurch is running the shit in jail." With regard to the dangers facing defendant's family, the detective said "these southerners are gonna get pissed, they're gonna do something stupid. I have a feeling they're gonna come after someone's family." Another detective said, "If they can't find you maybe they find the next best thing. . . . And your family [is] counting on you to do the right thing because they're the ones that have got to go to school . . . [a]nd unfortunately, they're related to you. They have the same name as you. And every southerner that knows, because the southerners know who did this. . . . So unfortunately, that's going to affect your family." While the detectives pointed out the dangers facing defendant and his family as a result of the crime and his gang association, neither detective suggested that they would be the cause of any harm to defendant if he did not cooperate or imply, as defendant suggests, that they "might not help [defendant's] family with the repercussions if he did not confess."

Neither did the detectives promise defendant leniency by the court in exchange for a confession. During the first interrogation of defendant on February 24, a detective told defendant "the judge is gonna decide a sentence and that's all based upon your truthfulness and . . . how much responsibility you're gonna take for your actions." The officer immediately explained, "I don't want you to take the responsibility for other people's actions. I only expect you to take responsibility for your actions." Although during the March 7 interrogation the detective referenced the earlier interrogation, he did not expressly or implicitly repeat the statement that the judge would consider defendant's truthfulness is selecting a sentence.

Finally, we disagree with defendant's argument that his confession was the product of false promises that he would get a "deal" that would include his release from jail if he confessed. As defendant claims, the detectives repeatedly told defendant that they wanted to help him. For example, the detective said, "I'm just here trying to do my

8

job. But while I'm doing my job I want to help you out 'cause I don't believe that you are capable of doing something like this." He continued, "Here's the thing, man. If you don't want to talk to me, whatever. That's fine, you know, people don't want to talk to me all the time 'cause they always look at me as the bad guy . . . . But I'm here really, I'm here to try to help you. OK? Because I want to catch the bigger fish in this. . . . [¶] . . . And so, what you need to do is believe in us and trust us that we're here to try to help you out. But we can't help you out unless you tell your side of the story." The detectives repeatedly told defendant that they would need to talk to the district attorney before making any promises and that he would have to tell them what happened before they could decide how they could help him. One detective asked defendant, "Do you believe that we can't help you? Is that why you're not wanting to talk to us? Because, obviously I can't tell you that I can do X, Y and Z or make you any promises if I don't know whether or not you're going to cooperate." When defendant asked, "I ain't going to jail *tonight*," the detective responded "Well, let me see what I can [do], I need to talk to people above my pay grade to make that decision. I don't have the keys to make the decision. Ok? But I certainly have the ability to talk to people that can." After a short break, the detectives returned to the interrogation room and one stated, "I floated everything by my boss okay, and here's how this works okay. Everything, – the whole point of this is to get you to give an honest and accurate statement okay. And that includes you accepting responsibility for whatever involvement you have and not minimizing that involvement okay, 'cause it's all based upon truthfulness. It's that foundation of honesty and truthfulness from your statement that will be looked at to find out what it is, to what extent we can do anything. Now we've had people in your shoes and we've talked with people before okay, and . . . usually [it] happens one of two ways or somewhere in the middle okay. They don't cooperate where they lie and then in that case there's nothing that we can do to help them because once you lie your statement's no good. We have people that . . . think about it and they go all right, if that's the only ticket I got I'm gonna be honest about my involvement, I'm gonna tell the truth and they develop a foundation that allows . . . us to actually help you okay. . . . [¶] . . . [I]f you're up front, you don't

9

withhold anything then that's when we can talk about the conditions of what we can do. So it depends on you."

While the officers may have misled defendant to believe that they were trying to help him, they made no promises or guarantees of leniency. (Compare *People v. Holloway, supra*, 33 Cal.4th at pp. 115-116 [detective's statement that that extenuating "circumstances could 'make[ ] a lot of difference,' " was not a promise of lenient treatment in exchange for cooperation] with *People v. Vasila*, *supra*, 38 Cal.App.4th at pp. 874-875 [officer promised the defendant she would not initiate federal prosecution if he confessed to where the guns were hidden, suggested that as a first time offender defendant would receive probation under state law, and promised to release defendant on his own recognizance if he told them where guns were hidden].) Contrary to defendant's suggestion, the detective's statement that he wanted defendant to be "a very good witness and not a suspect" does not imply that he might not be jailed. Defendant's argument that the detectives "implied that he could 'avoid[]' ever having to 'go to court on this thing' if he cooperated" is not supported by the record.[4] Defendant's claim that detectives "said they would 'guarantee' that [he would not spend the rest of his life in prison ] if he told them his involvement" is also not supported by the record. The detective told defendant that his brother was "worried he's never gonna get to see you again." Then, the detective added, "I'll tell him that's not true. . . . [I]f you are anything like your brother and you tell us what you told us and he tells us what he tells us, it ain't gonna be like that. I guarantee that it's not gonna be like that." The detective may have been "guaranteeing" that

---

[4] The paragraph cited by defendant reads in relevant part: "I think the majority of the time you'd probably be ok with people coming forward to say what happened, when you get your day . . . to go to court on this thing and just, you have nothing to say. But it's unfortunate when some of those people you probably care about are gonna be the ones that . . . might have to do that. But you're the one that put them in that position. . . . It's not what I want. I want you to be honest. I want you to tell me what happened. I want you to tell me the truth. . . . And then that can all be avoided." We read this paragraph as suggesting that defendant's friends and family could avoid being witnesses at his trial if he cooperated.

defendant would see his brother again but he did not guarantee that defendant would not receive a life sentence.

Based on our review of the video recording of defendant's interrogation and the totality of the circumstances, we conclude that defendant's confession was voluntary.

The confession was not obtained in violation of *Miranda.*

Conceding that his trial attorney did not move to suppress his confession on the ground that it was obtained in violation of *Miranda*, defendant argues that his attorney's failure to do so amounts to ineffective assistance of counsel. To prevail on such a claim, the defendant must establish that his attorney's omission "fell below an objective standard of reasonableness" and demonstrate "a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." (*People v. Dickey* (2005) 35 Cal.4th 884, 907.) The Attorney General argues, among other things, that counsel did not render ineffective assistance because there was no *Miranda* violation.[5]

"In *Miranda*, *supra*, 384 U.S. 436, the United States Supreme Court established safeguards intended to protect the exercise of the Fifth Amendment privilege against self-incrimination by persons undergoing custodial interrogation. The court expressed concern that the use of psychologically coercive interrogation techniques, as well as the inherently coercive effect of incommunicado interrogation, would, in the absence of adequate safeguards, cause persons undergoing interrogation to incriminate themselves involuntarily. [Citation.] Accordingly, the high court held that police officers conducting custodial interrogations must warn suspects regarding certain constitutional rights, including the right to remain silent and the right to counsel." (*People v. Peevy* (1998) 17 Cal.4th 1184, 1191.) Once adequately warned, "[a] suspect may waive his right to remain

---

[5] Defendant also raises this argument in his habeas petition. In correspondence attached to defendant's petition, trial counsel explains that he did not move to exclude the confession on the ground that it violated *Miranda* because he did not believe he could demonstrate that petitioner made an unambiguous invocation of his right to remain silent. As discussed below, trial counsel's assessment was entirely reasonable.

11

silent; and, if he does so voluntarily, knowingly and intelligently, statements made during police interrogation may be used against him at trial. [Citations.] [¶] If a suspect who waived his *Miranda* right to remain silent *unambiguously and unequivocally* indicates later during the interrogation that he wishes to remain silent, the interrogation must stop. [Citations.] . . . To stop the questioning, the suspect 'must articulate his desire to [remain silent] sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be [an invocation of the right to remain silent].' " (*People v. Thomas* (2012) 211 Cal.App.4th 987, 1005-1006.) The admissibility of a statement made by a suspect after that person invokes his or her right to silence depends upon whether the right to cut off questioning was "scrupulously honored." (*People v. Peracchi* (2001) 86 Cal.App.4th 353, 362, citing *Michigan v. Mosley* (1975) 423 U.S. 96, 104.)

Defendant argues that this court should consider both his February 24 and March 7 interrogations in deciding whether his *Miranda* rights were violated. At the start of the February 24 interrogation, defendant was read the *Miranda* warnings and apparently indicated that he understood them. Then defendant answered a number of questions about his whereabouts on the night of the murder, claiming that he was in San Francisco. When the detective accused him of lying, defendant said something "unintelligible" to which the detective responded "what?" In response, defendant said, "I said I got the right to remain silent." The detective responded, "Yeah, you have a right to remain silent. But I think you should, you should think about . . ." and defendant interrupted by saying, "I don't want to talk about it. I don't know nothing." The detective then left the room for a short break but continued to question defendant when he returned. Defendant did not confess to any involvement and insisted for the remainder of the interrogation that he was in San Francisco on the night of the killing.

At the start of the second interrogation on March 7, defendant was again advised of his *Miranda* rights, including the right to remain silent, and he indicated that he understood his rights. After initially insisting that he was in San Francisco at the time of the shooting, defendant repeated "I got nothing else to say" or words to that effect at least four times over a period of approximately 14 minutes and refused to answer any of the

12

detectives' questions.[6] After 15 minutes of questioning, defendant again insisted that he was in San Francisco, before asking "What kind of help can I get from you?" When the detectives indicated that their assistance depended on his level of cooperation, defendant again said "I ain't got nothing to say. Y'all can just take me back to [jail.]" As the detectives continued to question him, defendant repeated, "I ain't got nothing to say" or "I don't want to talk about none of that shit" at least four more times. Finally, about 35 minutes after the interrogation began, defendant said "I don't want to go back to jail, man." He almost immediately went on to say, "Fuck this shit. I ain't trying to talk to you . . . I'm done with this shit," but he then acknowledged he had been present at the shooting and began to describe his involvement in the crime.

Although defendant was not asked on February 24 whether he wanted to waive his rights, his waiver is implied by his responses to the detectives' questions about the shooting. (*People v. Cruz*, *supra*, 44 Cal. 4th at p. 667 ["A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her Miranda rights has itself been held sufficient to constitute an implied waiver of such rights."].) In his habeas petition, defendant contends that the detectives failed to "scrupulously honor" defendant's assertion of his right to remain silent when they continued to question him on February 24 and when they brought him back for additional questioning on March 7. Assuming that defendant unambiguously invoked his right to remain silent on February 24 and the officers failed to honor his request by continuing to question him after only a short break, defendant made no incriminating statements on February 24. Because the interrogation on March 7 occurred " 'after the passage of a significant period of time and the provision of a fresh set of warnings,' " it complied with *Miranda*. (*People v. Martinez* (2010) 47 Cal.4th 911, 950, quoting *Michigan v. Mosley*, *supra*, 423 U.S. at p. 106.)

---

[6] The transcript notes many "unintelligible" remarks by defendant during this period. While it is unclear what defendant was saying, he clearly did not indicate a desire to speak with the detectives.

At the March 7 interrogation, defendant stated he understood his rights but was not asked whether he wanted to waive those rights. His waiver is again implied by his responses to the detectives' questions. Defendant does not challenge the voluntariness of his initial waiver on March 7, but argues that almost immediately after his initial responses to the detectives' questions he invoked his right to remain silent and that the detectives violated his rights by continuing the interrogation.

Having initially waived the right to remain silent, a subsequent invocation of that right must be unambiguous and unequivocal, not mere expressions of passing frustration or animosity toward the interrogating officer or a refusal to discuss only a particular subject. (*People v. Williams* (2010) 49 Cal.4th 405, 433; *People v. Jennings* (1988) 46 Cal.3d 963, 977-978.)

In *Williams*, an officer repeatedly asked the defendant about the murder victim, and the defendant repeatedly answered that he did not know her. The officer persisted, asking what the defendant did with the victim. The defendant responded, " 'I don't want to talk about it.' " (*People v. Williams*, *supra*, 49 Cal.4th at p. 433.) The Supreme Court held this was not an invocation of the right to remain silent. The court explained: "In our view, the statement . . .—'I don't want to talk about it'—was an expression of [the] defendant's frustration with [the officer's] failure to accept [the] defendant's repeated insistence that he was not acquainted with the victim as proof that he had not encountered her on the night of the crime, rather than an unambiguous invocation of the right to remain silent. [Citations.] A reasonable officer could interpret [the] defendant's statement as comprising part of his denial of any knowledge concerning the crime or the victim, rather than an effort to terminate the interrogation." (*Id*. at p. 434.)

In *Jennings*, the defendant said to an officer during an interrogation: " 'I'm not going to talk,' " and, " 'You, nothing personal man, but I don't like you. You're scaring the living shit out of me. . . . That's it. I shut up.' " (*People v. Jennings, supra,* 46 Cal.3d at p. 977.) After reviewing a recording of the interrogation, the Supreme Court concluded the defendant's statements were not an invocation of the right to silence: "Viewing the tape, observing [the] defendant's demeanor before, during, and after the statements, and

14

considering the context in which [the] defendant made the statements on which he relies here, we conclude that the statements reflect only momentary frustration and animosity toward [the questioning officer]. It is evident that [the] defendant believed [the officer] was misconstruing [the] defendant's statements and persisting in his attempt to get [the] defendant to recall details about his whereabouts [after he already said he could not recall]." (*Id*. at p. 978.)

In this case, after being read his *Miranda* rights defendant told the detectives that he thought that someone had already been taken into custody for the murder and repeated his claim that he was in San Francisco at the time of the shooting. Defendant's initial statements that he had "nothing else to say" cannot be understood as an unambiguous and unequivocal assertion of a right to remain silent. Some of defendant's subsequent statements clearly indicated a desire not to talk about specific subjects (e.g. his brother's dog and what he likes to do in his spare time) or reflect frustration with the officers, but not the invocation of a right to remain silent. Most importantly, twice during the course of the interrogation defendant indicated he was open to continued discussion with the officers by asking what kind of help he could get from them and indicating that he didn't want to go back to jail.

*In re Joe R*. (1980) 27 Cal.3d 496 is instructive. In that case, the defendant first gave an exculpatory version of his involvement in the events and then, when the interrogating officer accused him of lying and produced inculpatory evidence found at his house, the minor said, "That's all I got to say" or "That's all I want to tell you." (*Id*. at p. 513.) The officers continued to question the minor and ultimately obtained his confession. At trial, defendant attempted unsuccessfully to suppress his confession on the ground that it was obtained in violation of *Miranda*. On appeal, the court found that defendant's statements "That's all I have got to say," or "That's all I want to say," were not unequivocal requests to halt the police interview. (*Id*. at p. 515.) The court explained that in context, "[i]t was not unreasonable for the court to endorse the prosecutor's inference that what the minor was saying was, That's my story, and I'll stick with it." (*Id*. at p. 516.) The same can be said of defendant's statements in the present case.

Accordingly, because there was no *Miranda* violation, there was no ineffective assistance of counsel in the failure to object on that ground.

2.    *Cruz Bastida's Statement*

Defendant contends his brother's recorded statements to the police were coerced and that the admission of the brother's statements violated his rights to due process and a fair trial. Defendant acknowledges that he did not object to the admission of this evidence at trial, but argues that "[c]hallenges to the admission of involuntary statements are a well-established category of claims which may be reviewed on appeal in the absence of an objection below." Alternatively, he contends his counsel's failure to object amounts to ineffective assistance of counsel. In his habeas petition, defendant argues that even assuming Cruz's statement was admissible, defense counsel provided ineffective assistance of counsel by failing to investigate and present at trial expert testimony regarding Cruz's cognitive impairments.

In *People v. Kennedy* (2005) 36 Cal.4th 595, 611-612, overruled on different ground in *People v. Williams*, *supra*, 49 Cal.4th at page 459, the court held that a defendant's failure to object on grounds of coercion barred review of the claim that coerced testimony was erroneously admitted at trial. The court explained, " '[A]s a general rule, "the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal." [Citations.] This applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights.' " *People v. Underwood* (1964) 61 Cal.2d 113, cited by defendant, is distinguishable because the evidence that the relevant statements in those cases coerced was "uncontroverted." (*Id.* at p. 126.) To the extent that *Underwood* and its progeny are inconsistent with the holding in *Kennedy,* we are bound by the Supreme Court's more recent decision. Accordingly, defendant has forfeited his direct challenge to the admission of this evidence.

Defendant contends that his attorney rendered ineffective assistance by failing to object to Cruz's statements on the ground that they were involuntary. As set forth above, to prevail on such a claim, the defendant must establish that his attorney's failure to

16

object was both unreasonable and prejudicial. (*People v. Dickey*, *supra*, 35 Cal.4th at p. 907.) As with defendant's *Miranda* claim, the failure to object was not unreasonable or prejudicial because the statements were voluntary.

A witness's statements are deemed coerced if they are the product of police conduct which overcomes the individual's free will. (*People v. Lee* (2002) 95 Cal.App.4th 772, 782.) "[E]vidence which is produced by coercion is inherently unreliable and must be excluded under the due process clause." (*Id.* at pp. 786-787.) In *Lee*, the court held a third party witness's statement was coerced because the police threatened to charge the witness with the crime at issue if he did not name the defendant as the shooter. (*Id.* at pp. 785-786.) The court explained that the officer's statements "went beyond mere deceit as to the evidence pointing to [the witness] as the killer. He also went beyond merely exhorting [the witness] to tell the truth. He even went beyond threatening [the witness] with prosecution for first degree murder unless he named the real killer. [¶] [The officer] in essence told [the witness]: We will prosecute you for first degree murder *unless* you name [the defendant] as the killer." (*Id.* at p. 785, italics added.) The court concluded that the interrogation of the witness was "not designed to produce the truth as [the witness] knew it but to produce evidence to support a version of events the police had already decided upon." (*Id.* at p. 786.)

Here, defendant contends Cruz's statements to the police were coerced by express threats to incarcerate defendant if Cruz did not cooperate and by implicit threats not to protect Cruz and his family from the dangers posed by other gang members. Defendant argues that the detectives' conduct was particularly coercive in light of Cruz's age and his intellectual deficits.

Cruz was not under arrest at the time of the interview. Nor was there any suggestion that he was involved in the crime. He apparently went to the police station to speak with the detectives voluntarily. While Cruz testified at trial that he has been in special education classes since elementary school, the trial court expressly found prior to Cruz's testimony that he was competent to testify. It is not "obvious from the video of the interview," as defendant suggests, that Cruz's intellectual disabilities rendered him overly

17

susceptible to the detective's questioning. His struggles, reflected on the video recording, do not necessarily indicate a lack of understanding. Just as likely, they reflect the difficulty he was having in determining what information to give the police and what information to withhold for the benefit of his brother.

Most importantly, unlike the situation in *Lee*, the detectives here did not threaten to incarcerate defendant if Cruz did not make a specific statement. They exhorted Cruz to tell the truth about the conversation he had with defendant after the crime. At the start of the interview the detectives brought out that defendant had been released from jail where he had been serving time on a probation violation. The detective told Cruz, "That's a pretty big deal, right?" and continued, "if it was worse, . . . do you think they'd release him? Okay, so . . . let's just get to the bottom of it." The detectives informed Cruz that they had spoken with defendant already and that they needed Cruz to confirm and validate what defendant had told them. They assured Cruz that defendant wanted Cruz to give a statement. They warned Cruz, "Your brother's not getting out of this until I get the information from you. . . . Do you see what's . . . happening? Like he's out. We're not . . . goin' after him. Do you know why we're not goin' after him? . . . Because . . . tell me the information. That's the only reason why we're not goin' after him." The officer encouraged, "Your brother is . . . resting on what you're gonna . . . tell us because I'm either gonna believe your brother or not gonna believe him . . . based on your statements that you tell me. What did you talk about [with] your brother . . . is all I'm here to find out. What . . . happened? Otherwise your brother is gettin' booked back in. I'll put him back in jail." A few moments later the detective reiterated "Your brother's case is resting on you, whether you tell me the truth or not. Okay? That way I can believe your brother. If I can't believe your brother, I'm putting him back in jail. You understand? So if you want your brother to go back in jail – hey don't tell me. We're done." The detective warned, " I'll send him back to jail. . . . Your brother's the one who wants you to talk so he can get out of – stay out of jail. Okay? What did he tell you about what happened and who actually did it and . . . what went wrong?" Although the detectives clearly misled Cruz, their conduct did not amount to coercion. (*People v. Watkins* (1970) 6 Cal.App.3d

119, 125 ["[D]eception which produces a confession does not preclude admissibility of the confession unless the deception is of such a nature to produce an untrue statement."]; *People v. Farnam* (2002) 28 Cal.4th 107, 182 ["Where the deception is not of a type reasonably likely to procure an untrue statement, a finding of involuntariness is unwarranted."].) The detectives did not suggest to Cruz any particular words to attribute to defendant. They said only that his account of the conversation should be accurate, in order to correspond to the story defendant had given them earlier. Because Cruz's statement was not involuntary, defense counsel did not render ineffective assistance in failing to seek to exclude Cruz's statement on that basis.

Likewise, counsel was not ineffective in failing to present expert testimony at trial regarding Cruz's cognitive impairments. Defendant argues that if counsel had properly investigated Cruz's mental health, "he would have discovered that Cruz did not merely have a borderline IQ and was not just 'simple,' as defense counsel described him. Rather, Cruz has an intellectual developmental disorder (mild mental retardation) and had an untreated attention deficit hyperactivity disorder (ADHD)." This evidence, defendant argues, "made [Cruz] more vulnerable to coercion by the police and compliant, likely to engage in confabulation, unable to comprehend or even listen to interrogators' questions, and unable to reason during an interrogation" and "would have called into question Cruz's ability to understand any information [defendant] had given him and relate it to the officers with accuracy." As defendant acknowledges, however, counsel did present evidence of Cruz's intellectual limitations at trial and, more importantly, the jury saw him testify and watched his video recorded statements. Counsel argued in closing argument that Cruz was trying to tell the detectives whatever he thought might help his brother and attributing to defendant information he had heard on the news and from friends. Defense counsel argued, "this is something common that happens in an interview when there are coercive tactics that are taking place. This is even more common with somebody who is more simple." We need not determine whether counsel's performance was inadequate, because it is not reasonably likely that additional testimony regarding Cruz's mental

19

health would have resulted in a more favorable verdict. We find no ineffective assistance of counsel in this regard.

3.      *Instructional Error*

The trial court gave numerous instructions to aid the jury in evaluating the testimony of witnesses, including CALCRIM No. 226. This instruction told the jury it could consider any fact that had a tendency to prove or disprove the truthfulness of the testimony of the witness, including prior inconsistent statements, the demeanor of the witness while testifying, and the existence or nonexistence of bias or interest.[7] Defendant

---

[7] As given to the jury, CALCRIM No. 226 read: "You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have. [¶] You may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe.[¶] In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors that you may consider are: [¶] > How well could the witness see, hear, or otherwise perceive the things about which the witness testified? [¶] > How well was the witness able to remember and describe what happened? [¶] > What was the witness's behavior while testifying? [¶] > Did the witness understand the questions and answer them directly? [¶] > Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided? [¶] > What was the witness's attitude about the case or about testifying? [¶] > Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony? [¶] > How reasonable is the testimony when you consider all the other evidence in the case? [¶] > Did other evidence prove or disprove any fact about which the witness testified? [¶] > Did the witness admit to being untruthful? [¶] > Has the witness engaged in [other] conduct that reflects on his or her believability? [¶] Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember. Also, two people may witness the same event yet see or hear it differently. [¶] If you do not believe a witness's testimony that he or she no longer remembers something, that testimony is inconsistent with the witness's earlier statement on that subject. [¶] If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or, if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest."

20

contends that the jury should have been instructed further that it could consider evidence of coercion in determining whether his and Cruz's statements were reliable.

Defendant relies on *People v. Underwood, supra,* 61 Cal.2d at page 124 in which the court held that "uncontradicted evidence" of coercion warranted a sua sponte cautionary instruction on the jury's use of a witness's prior inconsistent statements that were elicited involuntarily. However, the sua sponte instruction is required only when the evidence of coercion is uncontradicted and the witness's prior statement involuntary. (*People v. Ervin* (2000) 22 Cal.4th 48, 83 [when the evidence of coercion is in dispute, the court has no duty to modify an instruction in the absence of an appropriate request by defense counsel.) As the court in *Erwin* explained: "[T]he court instructed the jury that it could consider 'the existence or nonexistence of a bias, interest or other motive' in evaluating witness testimony. Given the conflicting evidence on the voluntariness of [the witness's] statement, no further instructions were required in the absence of a defense request on that subject. [Citation.] As a practical matter, most jurors would realize that promises of leniency or other coercion could induce false statements." (*Ibid*.)

As defendant acknowledges, defense counsel did not request modification of the standard instructions regarding the evaluation of witness credibility. We need not determine whether a modification would have been required if requested as defendant was clearly not prejudiced by the absence of a modified instruction. The instructions given, when combined with counsel's closing argument, more than adequately put the issue of coercion before the jury.

4.      *Prosecutorial Misconduct*

Defendant contends that the prosecutor committed misconduct in closing argument by misstating the burden of proof.

The jury was instructed on the prosecutor's burden of proof pursuant to CALCRIM No. 220, as follows: "The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial. [¶] A defendant in a criminal case is presumed to be innocent. This presumption requires

21

that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless that evidence proves the defendants guilty beyond a reasonable doubt, they are entitled to an acquittal, and you must find them not guilty."

On rebuttal, the prosecutor argued: "When you look at the defense chart about, you know the different burdens of proof, and they list a whole bunch of different burdens on the bottom, and they always put, you know, reasonable doubt way at the top. And it is. At a criminal level, it is. But there's other burdens that go above it. You know, beyond all doubt. Beyond a shadow of a doubt. Beyond a scientific certainty. All those things are higher than reasonable doubt. *The doubt has to be reasonable. It has to leave you with an abiding conviction that this is true*. [¶] And the evidence is there. The evidence is there that what he did in going to rob Jessie Amaya with Mario Vasquez led to the death because Mario Vasquez shot Jessie Amaya in the back of the head because of the defendant's help. [¶] *It's an abiding conviction. It's something you can hang your hat on, and the evidence you have here is something you can hang your hat on*." (Italics added.)

Contrary to defendant's argument, neither of the italicized statements misstates the law. The argument that "*The doubt has to be reasonable. It has to leave you with an abiding conviction that this is true*" is arguably confusing insofar as it is unclear what the "it" that starts the second sentence refers to. Defendant assumes "it" refers to the "doubt" and argues that the prosecutor shifted the "burden of showing reasonableness onto the defense." Read in context, however, it appears that the prosecutor was indicating that the prosecution's evidence must leave the jury with an abiding conviction that the charge is true. The prosecutor's argument that an "abiding conviction" is something you "can hang your hat on" did not, as defendant suggests, "trivialize[] the burden of proof." In any

22

event, as inartful as the argument may have been, it was certainly not "so egregious" as to "infect[] the trial with unfairness" and violate defendant's federal right to due process, particularly given the court's clear instructions on the applicable burden of proof. (*People v. Hill* (1998) 17 Cal.4th 800, 819.)

5      *Gang Testimony*

Defendant argues that "the trial court's admission of unreliable, testimonial hearsay during Detective Stockton's gang expert testimony violated [defendant's] confrontation rights and his federal due process rights." He also asserts that the trial court abused its discretion under Evidence Code section 352 in admitting highly inflammatory, and prejudicial gang evidence.

As defendant notes, currently pending before the California Supreme Court are multiple cases involving whether a gang expert's reliance on testimonial hearsay violates the defendant's Sixth Amendment confrontation rights. (*People v. Sanchez* (2014) 223 Cal.App.4th 1, review granted May 14, 2014 (S216681); *People v. Archuleta* (2014) 225 Cal.App.4th 527, review granted June 11, 2014 (S218640).) We need not address the issue because we conclude defendant was not prejudiced by any potential error. As the Attorney General argues, "given [defendant's] own admission to Detective Stockton that he was a Norteño, the parties' stipulation that Norteños are a criminal street gang and other evidence of a gang-related motive, jury findings that the crimes were committed for the benefit of, or in association with, a gang were inevitable. Any possible constitutional error was therefore harmless beyond a reasonable doubt."

Defendant's argument under Evidence Code section 352 is equally unavailing. Defendant acknowledges that the expert gang testimony was relevant to the gang enhancement, but contends that some of it should have been excluded on the ground that the evidence was unduly inflammatory and prejudicial. He argues, "The most damaging of Detective Stockton's testimony involved alleged incidents in which appellant, according to unknown individuals: threatened people with a handgun while making gang-related remarks in a church parking lot; was at a gang house party filled with numerous firearms and drugs; was found next to an SKS rifle and live ammunition; and was in a car

23

involved in an apparent drive-by shooting. Also highly inflammatory was the testimony that appellant's alleged compatriots . . . were responsible for a stabbing, an attempted murder, and a carjacking."

The "undue prejudice" with which Evidence Code section 352 is concerned is "not . . . evidence that proves guilt, but . . . evidence that prompts an emotional reaction against the defendant and tends to cause the trier of fact to decide the case on an improper basis." (*People v. Walker* (2006) 139 Cal.App.4th 782, 806.) Given that the evidence of the incidents to which defendant objects are no more egregious or inflammatory than the crime charged in the present case, it is highly unlikely that the jury's passions were so inflamed as to decide the case on a improper basis. (See *People v. Whisenhunt* (2008) 44 Cal.4th 174, 205; *People v. Ewoldt* (1994) 7 Cal.4th 380, 405.) There was no prejudicial error in the admission of the gang testimony.

6.      *Brady Error*

In *Brady v. Maryland, supra,* 373 U.S. at page 87, the United States Supreme Court held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The high court later held the duty to disclose such evidence exists even when the accused has not requested it. (*United States v. Agurs* (1976) 427 U.S. 97, 107.) Disclosure is required only if the evidence is "both favorable to the defendant and material on either guilt or punishment." (*In re Sassounian* (1995) 9 Cal.4th 535, 543.) "Evidence is 'favorable' if it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses." (*Id*. at p. 544.) "Evidence is 'material' 'only if there is a reasonable probability that, had [it] been disclosed to the defense, the result [of the proceeding] would have been different.' " (*Ibid*., quoting *United States v. Bagley* (1985) 473 U.S. 667, 682.) "The requisite 'reasonable probability' is a probability sufficient to 'undermine[ ] confidence in the outcome' on the part of the reviewing court. [Citations.] It is a probability assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract." (*In re Sassounian*,

24

*supra*, at p. 544.) The showing of a mere possibility of a different outcome is insufficient. (*Strickler v. Greene* (1999) 527 U.S. 263, 291.)

"Under the due process clause of the Fourteenth Amendment to the United States Constitution, a prisoner may seek relief in habeas corpus on the ground that the prosecution did not disclose evidence." (*In re Sassounian, supra*, 9 Cal.4th at p. 543.) The petitioner bears the burden of proving his or her claim by a preponderance of the evidence. (*Id*. at pp. 546-547.) "For purposes of analyzing materiality, we consider both the evidence submitted in support of the petition for writ of habeas corpus and the record of the trial." (*In re Brown* (1998) 17 Cal.4th 873, 888, fn. 8.) " '[T]he reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case.' " (*Id*. at p. 887.) In the same vein, "[i]n determining whether there is a reasonable probability that disclosure of [the] evidence would have yielded a different outcome under *Brady*, ' "the court must consider the non-disclosure dynamically, taking into account the range of predictable impacts on trial strategy." ' " (*People v. Gaines* (2009) 46 Cal.4th 172, 184.)

In his habeas petition, defendant argues "the prosecution violated *Brady v. Maryland*, *supra*, 373 U.S. 83 by failing to disclose to the defense extensive evidence undermining the credibility and competence of Dr. Susan Hogan, the state's forensic pathologist, and demonstrating that she was being terminated for deficiencies in reporting cause and manner of death in multiple autopsies." Correspondence attached to defendant's petition establishes that trial counsel believed that it was "readily apparent" that the accuracy of Hogan's conclusion that the gunshot wound was a contact wound "was irrelevant to the charges and enhancements as alleged. There was not a single charge or enhancement with a required element of proof re: a contact wound vs. a gunshot wound from a distance."

Defendant contends that trial counsel's assessment of the materiality of the evidence is incorrect. He argues, "The prosecution had no eyewitness testimony as to what actually occurred during the shooting. Accordingly, Dr. Susan Hogan's testimony that Jesus Amaya died due to a contact gunshot wound was the primary evidence the

prosecution used to prove that the gunshot was intentional. In the absence of such physical evidence to support a finding of intentionality, there was a possibility that Jesus and Mario struggled with the firearm and it went off accidentally. Indeed, there was evidence that Jesus Amaya was a hothead who liked to fight, he had physically fought petitioner prior to the shooting, and he was highly intoxicated with a blood alcohol level of .27. Therefore, in the absence of some physical evidence of an intentional shooting, a scenario in which Mario fired the firearm accidentally during a fight or struggle with Jesus Amaya was far from implausible. Moreover, it was the prosecution's burden to prove an intentional discharge of the firearm, so affirmative evidence of intentionality was required. Dr. Hogan provided that evidence by testifying to a contact gunshot wound."

We agree with trial counsel that the additional evidence, while perhaps favorable, was not material. Nothing in the record supports a theory of an accidental discharge and there is no likelihood this additional impeachment evidence would have led the jury to conclude the shooting was not intentional. Nor is it likely that the disclosure of this evidence would have led to a change in trial tactics. Trial counsel cross-examined Hogan extensively on her conclusions, including her conclusion that the wound was a contact wound. He pointed out that her conclusion that the contact wound would have caused the victim to be "stopped dead" was inconsistent with the evidence that the victim traveled approximately 100 feet after being shot. The purpose of the cross-examination, as defendant acknowledges, was to support his argument to the jury that the prosecution's evidence in general was unreliable. The suppressed evidence would merely have provided additional impeachment on the same issue, but would not likely have affected the jury's findings.

## Disposition

The judgment is affirmed.

_____
Pollak, J.

We concur:


_____
McGuiness, P. J.


_____
Jenkins, J.